# Exhibit 2

# ANYSOURCE TRIAL AGREEMENT

| | |
|---|---|
| **Customer**: People Center, Inc., d/b/a Rippling ("Rippling") | **Provider**: Anysource, Inc. |
| **Address**: 430 California Street, FL 11 San Francisco, CA 94104 | **Address**: 228 Park Ave S PMB 232249 New York New York 10003-1502 |
| **Email**: invoices to payables@rippling.com; legal notices to notices@rippling.com | **Email**: security@anysource.com, legal@anysource.com |

## Services and Fees

| | |
|---|---|
| **Services** | Enterprise AI/MCP Gateway (self-hosted) and related support |
| **Trial Period** | Four (4) months from Effective Date |
| **Trial Fee** | USD $400 per month |
| **Payment Terms** | Net 15 days |

## Special Conditions

1. **Trial Only.** Nothing herein shall be deemed as a commitment by, or requirement of, Customer to enter into a follow-on subscription and/or order form. The Terms and Conditions attached hereto will only apply to the Trial. The parties will negotiate in good faith the commercials and terms and conditions applicable to any follow-on subscription(s) and/or order form(s).
2. **Self-Hosted Deployment**. Customer will deploy the MCP Gateway entirely inside its own VPC; Provider receives no business data.
3. **Service Level Agreement (Applies to theTrial Period)**:
   - 24/7 email support with 4-hour response time for Critical issues
   - Monthly maintenance windows: 2nd Sunday, 2-6 AM ET

This Agreement (this "**Agreement**") is made as of the date of last signature below ("**Effective Date**") by and between People Center, Inc. dba Rippling ("**Customer**") and Anysource, Inc. ("**Provider**" or "**Service Provider**").

This Agreement includes and incorporates this signature page, the attached Terms and Conditions, and contains, among other things, warranty disclaimers, liability limitations and use limitations. Terms not defined in the Terms and Conditions shall bear the meaning ascribed to them on this page, including the table above.

| People Center, Inc. dba Rippling ("Customer") | Anysource, Inc. ("Provider") |
|---|---|
| By: *Ankur Bhatt* <br> CF8A07416CED413... <br> Ankur Bhatt | By: *Andrew Berman* <br> 5104272B577E4BE... <br> Andrew Berman |
| Name: _____ | Name: _____ |
| Title: Head of AI, Engineering | Title: CEO |
| Date: 7/31/2025 \| 5:18 PM PDT | Date: 7/31/2025 \| 5:01 PM PDT |

# TERMS AND CONDITIONS

# 1. SERVICES

## 1.1 Services and Documentation

During the Trial Period, Customer may access and use the Services solely for evaluation purposes, including use in production environments. Provider grants Customer a non-exclusive, non-sublicensable, non-transferable, worldwide license to use all documentation during the Trial Period.

## 1.2 Accounts

Provider will provide credentials and connections within one business day after the Effective Date. Customer is responsible for maintaining the confidentiality of its Credentials.

## 1.3 Restrictions

Customer will not: (i) copy, modify, create derivative works of, or distribute the Services; (ii) rent, lease, loan or resell the Services; (iii) reverse-engineer, disassemble or decompile the Services; or (iv) export the Services in violation of U.S. export laws.

## 1.4 Customer Data

"Customer Data" means means any data, text, information and other content that Customer or its authorized users submit, upload, or otherwise transmit to the Services or make available to Provider through the Services. Provider may use Customer Data solely to provide the Services to Customer during the Pilot Term. Provider may use Usage Data (as defined herein) for internal business purpose; provided in all cases Usage Data it cannot identify Customer or any individual. Provider must protect Customer Data with at least reasonable care.

# 2. FEES, PAYMENT AND TAXES

## 2.1 Trial Period Fees

Customer shall pay Trial Fees N15 days from receipt of invoice. Trial Fees are non-refundable.

## 2.2 Reserved

## 2.3 Late Payments

Overdue amounts will accrue interest at one and one-half percent (1.5 %) per month (or the maximum rate permitted by law, if lower). Provider may suspend the Services ten (10) days after providing written notice of late payment, if any undisputed amount remains unpaid.

## 2.4 Taxes

All Fees exclude taxes. Customer will pay all applicable sales, use, and similar taxes, excluding Provider's income taxes.

# 3. PROPRIETARY RIGHTS; FEEDBACK

### 3.1 Customer Ownership

(a) Customer Data. As between the parties, Customer retains all right, title, and interest in and to the Customer Data (including any outputs generated by the Services that are derived from Customer Data).

(b) Usage Data. Provider retains all right, title, and interest in and to aggregated, anonymized and de-identified information and telemetry regarding the provision, use, or performance of the Services ("Usage Data"). For the avoidance doubtUsage Data  cannot identify Customer or any individual. Provider grants Customer a non-exclusive, worldwide, royalty-free licence to use any Usage Data that is embedded in Customer's own logs or reports solely for Customer's internal business purposes.

### 3.2 Provider Ownership

Provider owns and retains: (i) the Services (and any documentation related thereto), and all improvements, enhancements or modifications made thereto by any party; and (ii) Provider's name, logo, and other trademarks; and (iii) all intellectual property rights in and to any of the foregoing.

### 3.3 License Grant

License. Subject to Customer's compliance with this Agreement, Provider grants Customer a limited, non-exclusive, non-transferable, non-sublicensable license to deploy and use the Services only during the Trial Period for its internal business purposes. Upon any expiration or termination of this Agreement, Customer will (a) cease all use of the Services, (b) delete or destroy all copies of the Services (including container images, Helm charts, Terraform files, and any derivatives) in its possession or control, and (c) certify such deletion in writing at Provider's request and, at Provider's further written request, provide reasonable evidence (including screenshots or system deletion logs) confirming such deletion and permit Provider, on no more than one (1) occasion per calendar year, to verify compliance under a mutually executed non-disclosure agreement.

### 3.4 Feedback

Customer may, but is not required to, provide suggestions, comments, ideas, or know-how, in any form, to Provider related to the Services ("Feedback"). Nothing in this Agreement will restrict Provider's ability to use, profit from, disclose, publish, keep secret, or otherwise exploit Feedback without compensating or crediting Customer, except that Feedback does not include Customer's Confidential Information or Customer Data and may not be used in any way that could identify Customer or any individual. Notwithstanding the foregoing, nothing in this section licenses any patents or copyrights of Customer, or transfers any intellectual property rights from Customer to Provider. All Feedback provided by Customer to Provider shall be provided on an "as is" basis with no warranty. The obligations and rights in this Section will survive any expiration or termination of the Agreement.

# 4. CONFIDENTIALITY

## 4.1 Confidential Information

Confidential Information. Any information that either Party receives, in whatever form or medium, from the other party ("Discloser") that is identified as "confidential" or that would reasonably be considered confidential or proprietary by a party experienced in the industry and based upon the nature of the information or the circumstances under which it was disclosed, including Customer Data and any personal information, shall be "Confidential Information."

## 4.2 Obligations

Obligations. The receiving party of such Confidential Information ("Recipient") shall keep confidential, and ensure its officers, directors, employees, accountants, attorneys, and other confidential advisors of Recipient (collectively, "Representatives") keep confidential, all Confidential Information and shall (a) use Confidential Information only as required to perform its obligations or as otherwise permitted under this Agreement ("Permitted Use"); (b) not disclose Confidential Information to any third party; (c) protect and safeguard Confidential Information to avoid unauthorized disclosure and use with the same degree of care as Recipient uses to safeguard and protect its own confidential information of a similar nature (but in no event less than a reasonable degree of care); (d) limit reproduction and dissemination of Confidential Information to what is strictly necessary in connection with the Permitted Use; and (e) notify Discloser immediately upon discovery of any suspected unauthorized use or disclosure of Confidential Information, and cooperate with Discloser to regain possession of the Confidential Information and prevent its further unauthorized use or disclosure. Recipient shall restrict disclosure of Confidential Information solely to those of its Representatives who "need to know" such Confidential Information to perform their responsibilities in connection with the Permitted Use, and ensure Representatives are bound by obligations at least as strict as set in this Section 4.

## 4.3 Exclusions

Exclusions. Confidential Information does not include any information which Recipient can demonstrate

with written evidence: (a) is or becomes available to the public through no breach of this Agreement; (b) was previously known by Recipient without any obligation to hold it in confidence; (c) is received from a third party free to disclose such information without restriction; or (d) is independently developed by Recipient without the use of Confidential Information. Recipient may also disclose Confidential Information if required by law ("Compelled Disclosure"). Prior to such Compelled Disclosure, unless prohibited by law, Recipient must notify Discloser to enable it to seek a protective order or otherwise prevent or restrict such disclosure. If Discloser fails to prevent or restrict such Compelled Disclosure, Recipient will only disclose Confidential Information legally required to be disclosed.

## 4.4 Return or Destruction

Return or Destruction. Upon the earlier of termination or expiration of this Agreement or a written request by Discloser, Recipient shall, at Discloser's choice, (i) promptly return all Confidential Information (including all copies, reproductions, compilations, summaries, and analyses thereof, together with any materials in any form which contain or are derived from Confidential Information), or (ii) destroy all of the aforementioned in a manner which preserves its confidentiality, and provide Discloser with a written certification thereof. Notwithstanding the foregoing, nothing herein obligates Recipient to return or destroy copies of Confidential Information that may be retained as part of Recipient's electronic archival activities in the ordinary course of business, provided that any Confidential Information so retained continues to be subject to this Section 4 until it is returned or destroyed. This Section 4 shall survive termination or expiration of the Agreement.

# 5. WARRANTIES

## 5.1 Mutual Warranties

Each party warrants: (a) compliance with applicable laws; (b) authority to enter this Agreement; (c) no conflicts with other obligations.

## 5.2 Provider Warranties

Provider warrants: (a) Services free from malicious code; (b) necessary third-party consents obtained; (c) no knowing IP infringement; (d) professional and workmanlike performance; (e) compliance with Documentation.

## 5.3 DISCLAIMER

EXCEPT AS EXPRESSLY PROVIDED, ALL SERVICES ARE PROVIDED "AS IS" WITHOUT WARRANTIES OF ANY KIND, INCLUDING MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

# 6. SERVICE LEVELS

## 6.2 Support

Provider shall provide 24/7 email support with response times of: Critical (4 hours), High (8 hours), Medium (24 hours), Low (48 hours).

# 7. TERM AND TERMINATION

## 7.1 Term

This Agreement begins on the Effective Date and continues through the Trial Period, unless earlier terminated in accordance with this Agreement. The Agreement will terminate at the end of the Trial Period.

## 7.2 Termination

- **For Breach**: Either party may terminate for material breach upon 30 days written notice (10 days for non-payment) if uncured

## 7.3 Effect of Termination

Upon termination: (a) access ceases immediately; (b) Customer deletes all Services copies; (c) fees remain due; (d) Confidentiality survives.

# 8. INDEMNIFICATION

## 8.1 Mutual Indemnification

Each party shall defend, indemnify and hold harmless the other from third-party claims arising from: (a) breach of this Agreement; (b) violation of laws; (c) gross negligence or willful misconduct.

## 8.2 IP Indemnification

8.2 IP Indemnification. Provider will, at its expense, defend Customer against any third-party claim that the Gateway, in the form delivered by Provider and used in accordance with this Agreement and the Documentation, directly infringes a patent, copyright, or trademark of such third party, and will pay those damages and costs finally awarded (or agreed in settlement) attributable to such claim. Provider's obligations will not apply to any claim arising out of or relating to:
(i) Customer Data;
(ii) designs, specifications, or instructions provided by Customer;
(iii) modification of the Gateway by anyone other than Provider;
(iv) combination of the Gateway with software, hardware, or services not supplied by Provider; or
(v) Customer's continued use of the Gateway after Provider notifies Customer to discontinue use and offers a non-infringing replacement.

This Section 8.2 states Provider's entire liability, and Customer's exclusive remedy, for infringement claims.

## 8.3 Procedures

Indemnified party shall: (a) promptly notify; (b) provide reasonable cooperation; (c) grant sole control of defense. No settlement without consent.

# 9. LIMITATION OF LIABILITY

## 9.1 Consequential Damages

EXCEPT FOR A PARTY'S BREACH OF THE CONFIDENTIALITY OBLIGATIONS HEREIN, NEITHER PARTY LIABLE FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE

DAMAGES OR LOST PROFITS.

## 9.2 Cap

EXCEPT FOR INDEMNIFICATION, CONFIDENTIALITY BREACHES, OR WILLFUL MISCONDUCT, TOTAL LIABILITY LIMITED TO FEES PAID OR PAYABLE IN PRECEDING 12 MONTHS.

# 10. GENERAL

## 10.1 Assignment

Neither party may assign without written consent, except to acquirer of substantially all assets.

## 10.2 Governing Law & Arbitration

Governed by New York law.  The parties will resolve any disputes relating to this Agreement by an arbitration proceeding under the then-current version of the American Arbitration Association's ("AAA") Commercial Arbitration Rules (the "AAA Rules"). The arbitration will be held before a single arbitrator appointed in accordance with the AAA Rules and will be conducted in New York City, NY or in another location that the parties agree to in writing.

## 10.3 Entire Agreement

This Agreement supersedes all prior agreements. Amendments must be written and signed.

## 10.4 Notices

Written notices to addresses above, with email copies to legal contacts.

## 10.5 Force Majeure

Neither party is liable for delays due to circumstances beyond reasonable control.

## 10.6 No Publicity

Provider shall not, without Customer's prior written consent on a case by case basis, use any of Customer's trademarks, logos, service marks, or trade names for any purpose or in any manner, including without limitation in any advertising, publicity, promotion, or other disclosures, or in any manner expressing or implying any endorsement of Provider's products or services.

# Exhibit A

**Technical and Organizational Measures to Ensure the Security of Data**

This Annex 2 describes the technical and organizational measures implemented by Service Provider to ensure an appropriate level of security, taking into account the nature, scope, context and purpose of the processing, and the risks for the rights and freedoms of natural persons.

**Minimum Technical and Organization Measures**

A. Service Provider has implemented and will maintain reasonable and appropriate technical and organizational measures to protect all data and information made available or provided by Rippling or on behalf of Rippling to Service Provider ("Data") against accidental loss, destruction or alteration, unauthorized disclosure or access, or unlawful destruction, including the policies, and procedures and internal controls set forth in this Annex 2.

B. More specifically, Service Provider's security program shall include, at a minimum:

**Access Control of Processing Areas**

Service Provider has implemented and will maintain reasonable and appropriate measures to prevent unauthorized access to the data processing equipment (namely telephones, database and application servers and related hardware) where Data is processed or used, including:

- establishing security areas and physical controls;
- protection and restriction of access paths;
- establishing access authorizations for employees and third parties, including the respective documentation;
- all access to the data center where Data is hosted is logged, monitored, and tracked; and
- the data center where Data is hosted is secured by a security alarm system, and other appropriate security measures.

**Access Control to Data Processing Systems**

Service Provider has implemented and will maintain reasonable and appropriate measures to prevent data processing systems where Data is processed and used from being used by unauthorized persons, including:

- use of industry best encryption technologies, including for data at rest and in-transit;
- identification of the terminal and/or the terminal user to Service Provider and processing systems;
- automatic temporary lock-out of user terminal if left idle, identification and password required to reopen;
- automatic temporary lock-out of the user ID when several erroneous passwords are

entered, log file of events, monitoring of break-in-attempts (alerts); and
- all access to data content is logged, monitored, and tracked.

## Access Control to Use Specific Areas of Data Processing Systems

Service Provider commits that the persons entitled to use their data processing system are only able to access the data within the scope and to the extent covered by their respective access permission (authorization) and that Data cannot be read, copied or modified or removed without authorization. This shall be accomplished by various measures including:

- employee policies and training in respect of each employee's access rights to the Data;
- allocation of individual terminals and /or terminal user, and identification characteristics exclusive to specific functions;
- monitoring capability in respect of individuals who delete, add or modify the Data;
- release of data only to authorized persons, including allocation of differentiated access rights and roles;
- use of industry standard encryption technologies, including for data at rest and in-transit; and
- control of files, controlled and documented destruction of data.

## Availability Control

Service Provider has implemented and will maintain reasonable and appropriate measures to ensure that Data is protected from accidental destruction or loss, including:

- infrastructure redundancy; and
- backup is stored at an alternative site and available for restore in case of failure of the primary system.

## Transmission Control

Service Provider has implemented and will maintain reasonable and appropriate measures to prevent Data from being read, copied, altered or deleted by unauthorized parties during the transmission thereof or during the transport of the data media. This is accomplished by various measures including:

- use of industry standard firewall, VPN and encryption technologies to protect the gateways and pipelines through which the data travels;
- Highly confidential employee data is encrypted within the system;
- providing user alert upon incomplete transfer of data (end to end check); and
- as far as possible, all data transmissions are logged, monitored and tracked.

## Input Control

Service Provider has implemented and will maintain reasonable and appropriate input control measures, including:

- an authorization policy for the input, reading, alteration and deletion of data;
- authentication of the authorized personnel;
- protective measures for the data input into memory, as well as for the reading, alteration and deletion of stored data;
- utilization of unique authentication credentials or codes (passwords);
- providing that entries to data processing facilities (the rooms housing the computer hardware and related equipment) are kept locked;
- automatic log-off of user ID's that have not been used for a substantial period of time; and
- proof established within Service Provider's organization of the input authorization; and
- electronic recording of entries.

**Separation of Processing for different Purposes**

Service Provider has implemented and will maintain reasonable and appropriate measures to ensure that data collected for different purposes can be processed separately, including:

- access to data is separated through application security for the appropriate users;
- modules within Service Provider's data base separate which data is used for which purpose, i.e. by functionality and function;
- at the database level, data is stored in different normalized tables, separated per module, or function they support; and
- interfaces, batch processes and reports are designed for only specific purposes and functions, so data collected for specific purposes is processed separately.

**Documentation**

Service Provider will keep documentation of technical and organizational measures in case of audits and for the conservation of evidence. Service Provider will ensure that persons employed by it, and other persons at the place of work concerned, are aware of and comply with the technical and organizational measures set forth in this Annex 2.

**Monitoring**

Service Provider has implemented and will maintain reasonable and appropriate measures to monitor access restrictions to Service Provider's system administrators and to ensure that they act in accordance with instructions received. This is accomplished by various measures including:

- individual appointment of system administrators;
- adoption of commercially reasonable and appropriate measures to register system administrators' access logs to the infrastructure and keep them secure, accurate and unmodified for at least six months;
- yearly audits of system administrators' activity to assess compliance with assigned tasks, the instructions received by Service Provider and Data Protection Law; and
- keeping an updated list with system administrators' identification details (e.g. name,

Docusign Envelope ID: 558A3B40-8586-41F3-A8D6-AF45AF8E34CB

surname, function or organizational area) and tasks assigned and providing it promptly to data exporter upon request.

**Limits on Retention/Destruction**

- Service Provider will destroy or dispose of records containing Data when there no longer exists any lawful basis for processing. Service Provider has implemented and will maintain reasonable and appropriate measures to securely destroy all Data consistent with Data Protection Law. Methods of performing these actions may include the use of a third party disk scrubbing utility or destruction of the drive, such as by degaussing, shredding, or other means of physically destroying data through specialized equipment and services.